**Rodney BRAGG, Petitioner**

v.

**Larry NORRIS, Director, Arkansas Department of Correction, Respondent**

**No. 5:98CV00540JFF.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

Dec. 8, 2000.

---

Rodney Bragg, Grady, AR, Pro se.

Patrick J. Benca, Hampton, Larkowski & Benca, J. Thomas Sullivan, Little Rock, AR, for Petitioner.

Orville Milton Fine, II, Arkansas Attorney General's Office, Little Rock, AR, Teena L. Watkins, Arkansas Govenor's Office, Little Rock, AR, for Respondent.

## MEMORANDUM AND ORDER

FORSTER, United States Magistrate Judge.

### I. PROCEDURAL HISTORY

On January 19, 1996, petitioner was convicted of delivery of a controlled substance

in the Nevada County Circuit Court. The jury sentenced petitioner to life imprisonment in the Arkansas Department of Correction.

Petitioner filed a direct appeal in the Arkansas Supreme Court alleging the following grounds for relief:

(1) the jury venire was not representative of a fair cross-section of the community with regard to black Americans; and

(2) the State improperly excluded three black Americans from the jury in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and

(3) the trial court erred in not excluding testimony concerning an alleged drug transaction that occurred in 1994 in Clark County; and

(4) the trial court erred by allowing hearsay statements into evidence; and

(5) petitioner's conviction was not supported by sufficient evidence.

Finding no error, the Court affirmed petitioner's conviction. *Bragg v. State*, 328 Ark. 613, 946 S.W.2d 654 (1997).

On July 21, 1997, petitioner, proceeding *pro se*, filed a petition in circuit court for post-conviction relief pursuant to Rule 37 of the Arkansas Rules of Criminal Procedure alleging the following grounds for relief:

(1) counsel was ineffective for failing to challenge the insufficiency of the evidence and preserve same for appellate review;

(2) counsel was ineffective for failing to challenge the evidence admitted at trial as being the drug which was allegedly bought from petitioner;

(3) counsel was ineffective for failing to subpoena John Nolan as a witness on petitioner's behalf;

(4) counsel was ineffective for failing to object to the admissibility of evidence introduced by the prosecution of prior arrest under Ark.R.Evid. 403;

(5) counsel was ineffective in failing to request a cautionary instruction and/or admonition to the jury; and

(6) the sentence received constitutes cruel and unusual punishment.

On September 16, 1997, the circuit court denied Bragg's petition. On September 19, 1997, petitioner wrote the Clerk of Nevada County Circuit Court requesting "a certified copy of the record designated on appeal in this Rule 37 action." He further stated that he had been allowed leave to proceed *in forma pauperis*. On September 24, 1997, petitioner filed a timely notice of appeal from the circuit court's order. In the notice, he designated the entire record of the Rule 37 proceedings and stated that he had ordered a certified copy of said records from the Circuit Court Clerk of Nevada County, Arkansas. On the same day, he filed a motion for court order directing the Clerk to furnish him, free of cost, with a certified copy of record designated on appeal. On October 1, 1997, the circuit court granted the motion, finding that Mr. Bragg should be provided a copy of the record at no cost.

On December 2, 1997, petitioner wrote the Circuit Court Clerk, asking her to advise him if the records had been tendered to the Arkansas Supreme Court and to give him an estimated date that the records would be completed so that the proper measures would be taken to insure timely filing with the Arkansas Supreme Court. On December 15, 1997, petitioner wrote the circuit judge. He stated that the Clerk did reply to his December 2, 1997, letter by mailing to him certified copies of some parts of the Rule 37 record, but none of the pertinent questions were answered. He stated that he had therefore filed a motion for extension of time for the purpose of appeal. On December 19, 1997, petitioner filed a motion in the trial court for extension of time to lodge the record.

The record was not tendered to the Arkansas Supreme Court until January 22, 1998, which was 120 days after the notice

of appeal was filed, and the Clerk of the Arkansas Supreme Court declined to lodge the record. Ark.R.App.P.5(a) requires a record to be tendered within ninety days of the notice of appeal. Petitioner filed a motion for rule on clerk, seeking to belatedly file the record. The Arkansas Supreme Court denied the motion for rule on clerk, finding that petitioner did not demonstrate good cause for failing to conform with the proper procedure. In so finding, the Court noted that petitioner, on December 19, 1997, had filed a motion in the trial court for extension of time to lodge the record, and that the ninety day period to file the record elapsed on December 23, 1997. The Supreme Court found that the motion for extension apparently was not acted on by the trial court. The Court found that it was the duty of the petitioner to obtain action on the motion for extension of time or tender the record to the Supreme Court by December 23, 1997. *Bragg v. State,* CR 98–341 (Ark.Sup.Ct. May 21, 1998)(unpublished).

On December 4, 1998, petitioner filed his initial petition for writ of *habeas corpus* in this court, (docket entry # 2), raising the following claims for relief:

(1) he was denied effective assistance of counsel because counsel failed to interview or call two witnesses whose testimony would have exonerated petitioner and failed to secure documentary evidence that would have exonerated petitioner;

(2) his conviction was obtained by the unconstitutional failure of the prosecution to disclose evidence favorable to petitioner; and

(3) the sentence imposed on petitioner constitutes cruel and unusual punishment in violation of the Eighth Amendment.

Respondent, in his response filed December 31, 1998, argued that petitioner's claims were procedurally defaulted because he had failed to properly raise the claims in the state proceedings. (Docket entry # 6) The court reviewed Mr. Bragg's petition and the respondent's response and, on January 11, 1999, ordered petitioner to provide a written statement describing the circumstances leading to his failure to obtain rulings on the grounds now procedurally barred. (Docket entry # 7)

Petitioner filed a detailed response citing very specific facts showing discrepancies in the testimony at trial. (Docket entry # 8) Additionally, petitioner's statements suggested that his attempt to timely appeal the Circuit Court's denial of his Rule 37 petition was impeded. Given petitioner's allegations supported by concrete evidence, the court ordered the respondent to file the trial transcript and records pertaining to petitioner's Rule 37 petition. (Docket entry # 10)

Respondent rapidly complied with the court's order and filed the required documents on April 28, 1999. (Docket entry # 12) Upon review of the transcript and records, the court found sufficient cause to appoint petitioner counsel. (Docket entry # 14)

On March 6, 2000, petitioner, assisted by counsel, filed an amended petition for writ of habeas corpus, (docket entry # 18), raising the following claims for relief:

(1) prosecutorial misconduct for reliance on perjured or false testimony;

(2) ineffective assistance of counsel; and

(3) the state failed to disclose exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In his amended petition, Mr. Bragg moved the court for an evidentiary hearing on these claims. Respondent, in his response filed April 10, 2000, again argued that petitioner's claims were procedurally defaulted because he had failed to properly raise the claims in the state proceedings. (Docket entry # 21)

After carefully reviewing petitioner's claims, the supporting evidence, and re-

spondent's response [1], the court found that an evidentiary hearing was necessary in this case. (Docket entry # 22); 28 U.S.C. § 2254(e)(2); *Townsend v. Sain,* 372 U.S. 293, 311, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963)(overruled in part, *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992)); *Clemmons v. Delo,* 124 F.3d 944, 952 (8th Cir.1997) (*Townsend* still the law with regard to a district court retaining power to hold a hearing even though one was not required); *see also United States ex rel. Maxwell v. Gilmore,* 37 F.Supp.2d 1078, 1090 (N.D.Ill.1999)(AEDPA restricts federal *habeas* court to hold evidentiary hearing when petitioner failed to develop facts in state court, but general discretion lies with district court judges whether to hold hearing).

On November 14–15, 2000, the court held an evidentiary hearing at the United States Courthouse in Texarkana, Arkansas. The court moved the venue to Texarkana to accommodate the witnesses who were mostly located in Clark and Nevada Counties. The court took testimony from fifteen witnesses and received 48 exhibits.

## II. EVIDENCE SUPPORTING BRAGG'S CONVICTION

### A. *Trial Summary.*

The Arkansas Supreme Court summarized the evidence at trial as follows:

The testimony presented at trial reveals the following facts. On March 26, 1993, Agent Keith Ray, an undercover officer for the South Central Drug Task Force, and Mark Smith [*sic*], a confidential informant, went to the residence of John Noland [*sic*] in Prescott for the purpose of purchasing cocaine. Agent Ray told Noland [*sic*] that he wanted to buy $50 worth of crack cocaine and Noland [*sic*] indicated that he had someone there who could help him. Noland [*sic*] then led Agent Ray to the kitchen door, where he instructed Ray to wait. Agent Ray observed three men sitting at the kitchen table with a large amount of what appeared to be crack cocaine. After Noland [*sic*] had spoken to one of them, that man got up from the table and came to where Agent Ray was standing and asked Ray what he wanted. Again, Agent Ray indicated that he wanted to buy $50 worth of crack cocaine. The man then handed Agent Ray one piece of the rock-like substance and Ray paid him $50.

After they had left the residence, Agent Ray described for Smith [*sic*], who was not present during the drug transaction, the man from whom Ray had purchased the drugs. Smith [*sic*] told Agent Ray that the man may have been Noland's [*sic*] cousin, Rodney Mitchell [*sic*]. When Agent Ray later viewed photographs of Mitchell [*sic*], however, he indicated that Mitchell [*sic*] was not the person who sold him the cocaine. Agent Ray was unable to identify the suspect for approximately one year.

On March 1, 1994, in Clark County Agent Ray conducted another undercover drug transaction, this time with another informant, Steve Krite. Agent Ray gave Krite $125 and Krite purchased several rocks of crack cocaine from a man he knew as "Rodney." During the transaction, Agent Ray positioned his vehicle where he could view the delivery, and he was able to see the man selling the cocaine. Recognizing the man as the suspect in the 1993 drug transaction, Agent Ray ran a check on the vehicle license number, and it came back to Appellant, Rodney Bragg. Agent Ray later contacted the Nevada

---

1. Respondent, in his response, states, "In light of Petitioner's allegations, Respondent can easily understand how this case would give the Court pause." He further argues, both in his response and post-hearing brief, that petitioner should file a request for clemency rather than for *habeas* relief. (Docket entries # 21, page 6 & # 49, page 3) The court disagrees.

County Sheriff's Office and obtained a photograph of Appellant, who Agent Ray positively identified as the individual who sold him the crack cocaine on March 26, 1993.

*Bragg v. State,* 328 Ark. 613, 618–619, 946 S.W.2d 654, 657 (1997).

## B. Agent Keith Ray's Trial Testimony

The linchpin of the State's case was the testimony of Agent Keith Ray. Ray testified that on March 26, 1993, he was working with confidential information Mark Smyth and went to the residence of John Nolen to purchase fifty dollars worth of crack cocaine. (Trial Tr., at 185–6). Agent Ray testified that he and Smyth presented themselves at Nolen's residence and the following occurred:

> [Nolen] advised me that he had a subject there that could serve myself. Mr. Noland [*sic*] went back toward the kitchen of his residence. At this time Mr. Smith [*sic*] advised Mr. Noland [*sic*] that he needed to use the restroom, and he left the room. Myself and Mr. Noland [*sic*] went to the kitchen door, he told me to stop there. I could see inside there was three subjects sitting as [*sic*] the kitchen table, and they had a large amount of off-colored rock like substance on the kitchen table that appeared to be what I know as crack cocaine.

> . . . . .

> Mr. Noland [*sic*] then spoke to one of the men that was sitting at the table, and he got up and came to the kitchen door stepped around, and he asked me what I was looking for I told him fifty. He took one piece of rock and handed it to me, and I handed him fifty dollars ($50.00) in the United States currency.

*Id.* at 191–192.

At that point in the trial, Agent Ray positively identified Rodney Bragg as the person who had sold him the cocaine. *Id.* at 192. Although Agent Ray allegedly made the drug transaction with Mr. Bragg

"face to face," at that time Agent Ray did not know the identity of the person with whom he was dealing. This factor is *critical* to the instant *habeas* petition.

Because Agent Ray did not know the person from whom he had just purchased cocaine, after leaving the residence Ray asked Smyth ". . . if he knew the name of the subject that was, that had sold to [him]. And [Ray] had described him to him as being tall and wearing glasses. And that he had seen him, and he advised me that he knew the guy's name was Rodney, that's all he could tell me. Later on, he thought it may have been Mr. Noland's [*sic*] cousin which was a Rodney Mitchel." *Id.* at 193.

Agent Ray then testified that he excluded Rodney Mitchel through photographs. Agent Ray stated, "Photographs were presented to myself and other agents of Mr. Mitchel and wasn't the same guy." *Id.* When asked if he "determined shortly after March 26th, that the Rodney Mitchel, [Nolen's] cousin, was not the person" from which he purchased cocaine, Ray testified, "That's correct sir." *Id.* at 207. Agent Ray reported that the photographs used to exclude Rodney Mitchel as a suspect were from the Nevada County Sheriff's Department. *Id.* at 213.

Agent Ray then explained that the case remained unsolved until a subsequent event in 1994 that led to the positive identification of Rodney Bragg. Agent Ray testified that he was working with an unwitting informant on March 1, 1994 in an adjacent county. *Id.* at 199. He testified that his informant was supposed to introduce him to a subject by the name of Rodney but that the subject would not make the sale directly to Ray. *Id.* at 200. Agent Ray thus gave $125 to the informant who made the purchase from the suspect's vehicle. *Id.* at 200–205.

Ray then testified to the following:

> After [the informant] got back into the vehicle, I took him to a location. As we were driving off, I run back into Mr.

Bragg and his vehicle and obtained a tag number. I had recognized Mr. Bragg from the transaction I had done with him here at Prescott, so I wanted to find out who he was. The tag number came back to a Rodney Bragg. At that time, I contacted Mr. Hillary here in Nevada County, asked him if he had any knowledge of Mr. Bragg or if Mr. Bragg had ever been arrested here, and he said yes.

*Id.* at 205.

Ray stated *at that time* he was able to ascertain that Mr. Bragg had previously been arrested, was able to locate a photograph of Mr. Bragg, that he viewed this photograph, and positively identified Mr. Bragg as the person who had sold him cocaine at Mr. Nolen's residence. *Id.* at 206. Identifying Mr. Bragg to the jury, Ray testified, "There is no doubt that this is the same person." *Id.*

In summarizing the testimony at trial, Bragg's conviction was sealed through testimony pertaining to three critical issues. First, Agent Ray was able to exclude Rodney Mitchel through photographs on file at the Sheriff's Department. Second, Agent Ray was able to uncover a name through running the license plate of the vehicle from which he allegedly witnessed a drug transaction. Third, after finding out the suspect's name, Agent Ray was able to positively identify this supposed drug dealer by reviewing photographs also on file at the Sheriff's Department. At the *habeas* evidentiary hearing, one of the prosecutors, Deputy Prosecuting Attorney Danny Rogers, reported that all three of these items were "very material . . . very material" to the prosecution's case against Mr. Bragg.

*C. Relevant Police Records.*

Keith Ray prepared a record of the March 1, 1994 transaction entitled "INVESTIGATOR'S NOTES." (Resp't.'s ex.

2. Although not an issue before this court, it is noteworthy that petitioner's vehicle was seized for involvement in an alleged drug

10) Interestingly, these notes were only unveiled to Mr. Bragg when he initiated an action in replevin against the prosecutor and others after Bragg's vehicle was seized for being used in an illegal drug transaction[2]. It was upon review of these notes that the tide began to turn against Agent Ray and this exculpatory evidence was revealed.

Relevant to the instant petition, Agent Ray stated the following in his investigator's notes:

This agent then watched the suspect Steve Crite walk up the sixteenth street at this time this agent saw Steve Crite meet a suspect in a gray car with Arkansas Plates XOM-157, at this time this agent watched the suspect Steve Crite hand the suspect in the vehicle a black male in his Thirties the money that this agent had given Crite. At this time this agent watched the suspect hand Steve Crite something out the window of the vehicle.

This agent and the informant then picked up Steve Crite at sixteenth and Gresham Streets. Steve Crite then handed this agent seven off white color rocks that this agent through prior experience and training recognized as being consistent with the controlled substance crack cocaine.

(Resp't.'s ex. 10, page 4)

In a continuation of the report entitled "DISPOSITION OF EVIDENCE," also dated March 1, 1994, Agent Ray stated, in pertinent part, the following:

This agent watched as another suspect purchased a quantity of suspected crack cocaine. This agent wrote down the tag number of the vehicle the suspect was driving, it came back to a Rodney L Bragg, who lives in Prescott Arkansas. Through further investigation this agent found that a Rodney L Bragg was arrested in Nevada County.

transaction occurring on March 1, 1994 where the charges were never prosecuted.

This agent was presented a photograph of the suspect arrested by Nevada County Sheriff's Department, at this time this agent identified the suspect as being the same suspect that this agent had made purchases from in Prescott Arkansas on March 26th 1993, and March 1st 1994 in Arkadelphia, Arkansas. This agent is positive that Rodney Mitchel and Rodney L. Bragg are the same person.

(Resp't.'s ex. 10, page 9)

## III. PETITIONER'S DOCUMENTARY EVIDENCE OF INNOCENCE

Petitioner has provided indisputable documentary evidence of his innocence, giving rise to an evidentiary hearing in the case. Although this documentary evidence standing alone suggests petitioner's claims have merit, it was through testimony at the hearing that conclusive proof of petitioner's claims was provided.

As reported above, critical to the State's prosecution of Mr. Bragg were (1) Bragg's identification through his license plate, (2) excluding Mr. Mitchel as a potential suspect through photographs on file at the Sheriff's Department, (3) and positively identifying Mr. Bragg as the actual perpetrator through photographs on file at the Sheriff's Department. Through tireless investigation by Mr. Bragg and his appointed counsel, Mr. Bragg was able to show the court that all three of these events were grossly incorrect and either fabricated or intentionally distorted.

With regard to Arkansas license plate XOM 157, petitioner has shown that he did not own the gray automobile in question nor the license plate until well after March 1st 1994. Petitioner provided proof in the form of a money order receipt, title, and bill of sale for the 1987 Ford Mustang showing the date of sale to be March 22, 1994. (Pet'r.'s ex. 19) Moreover, petitioner did not receive license tag number XOM 157 until March 23, 1994, as evidenced by the registration certificate from the Arkan-

sas Department of Finance and Administration (DF & A). *Id.*

With regard to photographs of Mr. Mitchel, Agent Ray supposedly excluded this suspect by viewing photographs on file at the Nevada County Sheriff's Department. However, petitioner provided a statement from the Sheriff's Department stating no photographs of Rodney Mitchel were ever on file. (Pet'r.'s ex. 8)

Finally, the photographs of Mr. Bragg, the photographs through which Agent Ray reported he identified Rodney Bragg, were not available until June 21, 1994. (Pet'r.'s ex. 4, page 6) Thus, Agent Ray could not have identified Mr. Bragg through photographs on March 1, 1994, or immediately thereafter, as he suggested in his report and at trial.

## IV. TESTIMONY AT EVIDENTIARY HEARING

Again, three areas of testimony by Agent Keith Ray were critical in securing the conviction of Rodney Bragg. Those three areas were shown to be in serious doubt through documentary evidence submitted by Mr. Bragg and his counsel. At the evidentiary hearing, those three areas of testimony by Agent Ray were shown to be absolutely misleading or untrue.

### A. Exclusion of Rodney Mitchel.

At trial, Agent Keith Ray testified that, "Photographs were presented to myself and other agents of Mr. Mitchel and wasn't the same guy." (Trial Tr., at 193) However, at the evidentiary hearing Agent Ray was confronted with the fact that photographs of a Rodney Mitchel were never on file at the Sheriff's Department. Investigator Wayne Kisselburg of the Nevada County Sheriff's Department testified that no records were on file for Rodney Mitchel and that the records dated back to 1982.

With no other plausible explanation, Agent Ray *admitted* he never saw any photographs of Rodney Mitchel. Thus,

Agent Ray unquestionably tainted the criminal trial by deceiving jurors with his admittedly false testimony that he excluded Rodney Mitchel as a suspect through photographs.

In his post-hearing brief, the respondent states, "Officer Ray's testimony at trial on this matter is open to interpretation." (Docket entry # 49, page 6) Again, Agent Ray's precise testimony was, "Photographs were presented to myself and other agents of Mr. Mitchel and wasn't the same guy." (Trial Tr., at 193) Given the statement above, Agent Ray unquestionably testified that he was presented with photographs of "Mr. Mitchel." The evidence now shows that there never was an individual named Rodney Mitchel, nor photographs of an individual purporting to be Rodney Mitchel. It is unfathomable how this matter may be open to interpretation.

Additionally, in his notes, Agent Ray stated, "This agent is positive that Rodney Mitchel and Rodney L. Bragg are the same person." (Pet'r.'s ex. 2, page 9) Thus, Agent Ray's exclusion of Rodney Mitchel could have, in turn, meant exclusion of Rodney Bragg. Hence, trial prosecutor Brent Haltom misled the jury when he allowed Agent Ray to testify that he excluded Mitchel through photographs. (Trial Tr. 193) Although his course of misleading jurors was most likely unintentional, the prosecutor misled them nonetheless.

Moreover, at the evidentiary hearing Agent Ray testified that he had no doubt in his mind that Mitchel and Bragg were one and the same. Agent Ray further admitted that, when he stated at trial that he excluded Mitchel, he knew that testimony was false.

*B. Identification of Rodney Bragg Through License Plate XOM 157.*

Although Agent Ray did not testify at trial about specific information pertaining to the vehicle driven during the alleged drug transaction, his notes describe a "gray car with Arkansas Plates XOM-157...." (Resp't.'s ex. 10, page 4) The investigator's notes linking Rodney Bragg to the vehicle were dated as if they were taken on March 1, 1994 and typed on March 3, 1994. *Id.* The automobile in question was a gray, 1987 Ford Mustang.

At the evidentiary hearing, petitioner called the former owner of the Mustang, Mr. Greg Beaver. Mr. Beaver testified that he put the vehicle up for sale during the middle of March 1994 and subsequently sold Mr. Bragg the vehicle. Mr. Beaver substantiated the bill of sale for the vehicle which showed a date of March 22, 1994. Mr. Beaver further substantiated the date of the sale through identification of a receipt from a cashier's check dated March 22, 1994. When asked if the Mustang could have been used by Mr. Bragg on March 1, 1994, Mr. Beaver testified, "Ain't no way possible ... he could be in that car."

Henry Morgan, the Clark County prosecuting attorney and current head of the South Central Drug Task Force, testified at the evidentiary hearing. Mr. Morgan was not involved in the prosecution of Mr. Bragg and testified that he learned of the discrepancies in Agent Ray's reports through the replevin action.

Mr. Morgan testified he was deeply troubled by the fact that Agent Ray's report listed the license plate XOM 157 weeks before the date of the sale of the automobile. Upon learning of the discrepancy, he personally investigated the issue to see if the discrepancy was a mere mistake or something more sinister. He contacted various sources looking for an explanation but could find nothing to explain Agent Ray's erroneous information. Part of his investigation involved contacting the Arkansas Criminal Information Center to see if an officer had called in that license plate or one similar during March 1, 1994. He found no information to put his discomfort to rest.

Mr. Morgan stated that the license tag was "crucial" to the case because it corrob-

orated the sale without testimony from the informant who at the time of trial was a convicted felon. Mr. Morgan reported that the information was "pretty crucial to [him]."

Mr. Morgan further testified he contacted Mr. Rip Wiggins, who was then the supervisor of the South Central Drug Task Force, and asked that he and Agent Ray come to his office. Mr. Morgan asked Ray for an explanation and Agent Ray was not able to provide any credible explanation. Based upon this meeting and his investigation into the matter, Mr. Morgan told Agent Ray that police credibility was essential and he would no longer use Ray's testimony to prosecute cases. This decision ultimately resulted in Agent Ray's resignation. (Pet'r.'s ex. 10)

Petitioner called Ms. Sharon Stallings of the Arkansas Crime Information Center, who ran a report of every time the license plate XOM 157 was run, or so called "hits." Ms. Stallings' report showed no "hits" for license plate number XOM 157 prior to June 3, 1994. (Pet'r.'s ex. 7) Although Ms. Stallings' report was somewhat telling, on cross examination Ms. Stallings revealed that the system only kept "hits" dating back for five years and she was not sure whether her report could have included the existence of "hits" on March 1, 1994.

Petitioner also called Agent Ray to testify regarding the vehicle. When asked specific information about the vehicle, Agent Ray gave equivocating answers. Despite the fact that the South Central Drug Task Force seized the vehicle and Agent Ray admittedly drove the vehicle for an appreciable amount of time, Agent Ray had difficulty answering whether Mr. Bragg was in that 1987 Ford Mustang the night of the alleged drug transaction. When asked if Mr. Bragg was in that specific vehicle the night of March 1, 1994, Agent Ray testified, that "to the best of my knowledge" Mr. Bragg was in *a* Ford Mustang. For whatever reason, Agent Ray was unwilling to link Mr. Bragg to the

1987 Ford Mustang in question when recounting events of March 1, 1994, even though he evidenced no reluctance earlier in seizing the car as an instrumentality of that crime.

With regard to how he took down the license tag number, Agent Ray continued to be evasive with his answers. Agent Ray admitted that he testified at trial that he saw the license number when he "run up on him later." He could not remember exactly how, but he knew he saw the vehicle again. When asked if he ran the license number at that time, Agent Ray equivocated and then said, "yes." Agent Ray further testified he did not know what license number he took down that night. When asked why his investigator's notes stated XOM 157, Agent Ray testified it was not a "false" report but that it was "incorrect."

Agent Ray later suggested that the discrepancy was due to needing to "re-do" many of his reports to correct misspellings and typographical errors. Agent Ray stated he begrudgingly had to "re-do" seventeen reports during a weekend in June or July. Although possibly plausible on its face, Agent Ray disturbingly admitted he destroyed the original reports and *admitted he changed material facts within the replacement reports.* Ultimately, Agent Ray admitted at the evidentiary hearing that the report he gave prosecutors could not have been correct.

### C. Identification of Rodney Bragg Through Photographs.

At trial, Agent Ray testified that after running the tag number he "contacted Mr. Hillary here in Nevada County, asked him if he had any knowledge of Mr. Bragg or if Mr. Bragg had ever been arrested here, and he said yes." (Trial Tr. at 205) He then testified that he was able to locate a photograph of Mr. Bragg, viewed the photograph, and was able to positively identify Mr. Bragg. *Id.* at 206.

Although Agent Ray testified he positively identified Rodney Bragg through Sheriff's Department photographs, Investigator Wayne Kisselburg of the Department testified at the evidentiary hearing that it would have been "impossible" to have had a picture of Mr. Bragg on hand anytime during the month of March 1994. Investigator Kisselburg stated the earliest that photographs of Mr. Bragg could have been on file was June 21, 1994 when Mr. Bragg was arrested on an unrelated domestic matter.

At the evidentiary hearing, Agent Ray testified that he saw the photographs of Mr. Bragg some time around June or July. Agent Ray agreed he testified at trial that he saw the photographs "at that time," but stated that his testimony was "wrong." Although Agent Ray was unwilling to squarely admit he had misled the jurors like he had done regarding the exclusion of Mitchel, his testimony was decisively perfidious.

### D. Testimony Regarding the March 1, 1993 Transaction.

Petitioner's conviction stems from an alleged sale of crack cocaine at the residence of John Nolen on March 26, 1993. Petitioner claims he is innocent and his conviction is false, thus the court examined Agent Keith Ray's testimony regarding this event. After examining the trial testimony and the testimony at the evidentiary hearing regarding this alleged drug transaction, the court finds they are remarkably different.

Although the alleged incident took place more than seven years ago, Agent Ray's testimony seemed contradictory for reasons other than his lapse of memory. Agent Ray was able to recount events with great detail when he so wanted. Likewise, he was seemingly intentional in his efforts to be vague with facts when he so wanted.

At trial, Agent Ray testified, in pertinent part, as follows:

Myself and Mr. Smith [sic] pulled up to the residence in my vehicle. Mr. Smith [sic] got out, wen to the door of Mr. Noland's [sic], knocked on the door, Mr. Noland [sic] came to the door, they went inside, maybe a minute, Mr. Smith [sic] came back outside and motioned for me to get out and to come on in. I went inside the door, Mr. Noland [sic] and Mr. Smith [sic] were standing there talking, Mr. Noland [sic] asked me what I was looking for referring to the drugs, and I told him I was looking for fifty dollars ($50.00) worth of crack cocaine. He told me that he had a guy -

. . . . .

He advised me that he had a subject there that could serve myself. Mr. Noland [sic] went back toward the kitchen of his residence. At this time Mr. Smith [sic] advised Mr. Noland [sic] that he needed to use the restroom, and he left the room. Myself and Mr. Noland [sic] went to the kitchen door, he told me to stop there. I could see inside there was three subjects sitting as [sic] the kitchen table, and they had a large amount of off-colored rock like substance on the kitchen table that appeared to be what I know was crack cocaine.

. . . . .

Mr. Noland [sic] then spoke to one of the men that was sitting at the table, and he got up and came to the kitchen door stepped around, and he asked me what I was looking for I told him fifty. He took one piece of rock and handed it to me, and I handed him fifty dollars ($50.00) in the United States currency.

(Trial Tr. 188–191)

At the evidentiary hearing, Agent Ray testified that Mr. Smyth went to Mr. Nolen's door and Mr. Nolen came outside and Smyth and Nolen had a discussion outside. Agent Ray then testified he was invited into the residence and Mr. Nolen summoned him into the kitchen where three subjects were sitting around the kitchen table. Finally, Agent Ray testified he gave the subject "$50 for 2 rocks." When

asked how much crack he purchased, Agent Ray stated, "I gave him $50 for 2 rocks. I do not know whether it was ½ gram or not."

From comparing the testimony at the evidentiary hearing to the trial testimony, three key discrepancies are noted. First, upon arriving at Mr. Nolen's residence, Mr. Smyth and Mr. Nolen talked outside and did not go inside the home and later come back outside. Second, Agent Ray stated he went into the kitchen to make the purchase whereas at trial he said he said he was stopped at the kitchen door and Mr. Bragg met him outside of the kitchen. Third, at trial Agent Ray testified he purchased *one* rock but at the evidentiary hearing he emphatically insisted he purchased *two* rocks[3]. The court also notes that Agent Ray stated in his investigator's notes that he purchased "one rock of crack cocaine." (Docket entry # 12, pages 7 & 8)

Also of importance, at trial Agent Ray testified that upon leaving the residence he did not know from whom he had purchased the cocaine and asked Mr. Smyth if he knew the subject. Agent Ray testified, "I asked Mr. Smyth if he knew the name of the subject that was, that had sold to me. And I had described him to him as being tall and wearing glasses. *And he had seen him,* and he advised me that he knew the guy's name was Rodney, that's all he could tell me." *Id.* at 192–193 (emphasis added). At the evidentiary hearing, both Agent Ray and Mark Smyth acknowledged that, other than Mr. Nolen, Mr. Smyth did not see anyone alleged to be inside the house.

## V. MERITS OF PETITIONER'S CLAIMS

### A. Procedural Default.

▆ As previously reported, petitioner failed to address the discrepancies above

in state court. Accordingly, respondent has correctly argued, petitioner's claims are procedurally defaulted and, despite the difficulty experienced by petitioner in appealing the denial of his Rule 37 petition, he is unable to establish cause and prejudice to excuse his procedural default. Because petitioner cannot establish cause to excuse his procedural default, this court may reach the merits of his claims only if he presents sufficient evidence of actual innocence in accordance with *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

### B. Actual Innocence.

In *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the United States Supreme Court reaffirmed the principle that "habeas corpus is, at its core, an equitable remedy." *Schlup,* 513 U.S. at 319, 115 S.Ct. 851, 130 L.Ed.2d 808. Given this basic principle, the Supreme Court has long recognized the duty of a district court to adjudicate procedurally defaulted *habeas* claims when failure to so would result in a "fundamental miscarriage of justice." *Id.,* at 320–21, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (*citing Sawyer v. Whitley,* 505 U.S. 333, 339–340, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); *McCleskey v. Zant,* 499 U.S. 467, 495, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); *Smith v. Murray,* 477 U.S. 527, 537, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Murray v. Carrier,* 477 U.S. 478, 495–96, 106 S.Ct. 2678, 91 L.Ed.2d 397 (1986); *Kuhlmann v. Wilson,* 477 U.S. 436, 452, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); *Engle v. Isaac,* 456 U.S. 107, 135, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)).

"To ensure that the fundamental miscarriage of justice exception would remain

---

**3.** At the evidentiary hearing, testimony was developed regarding a discrepancy in the amount of cocaine purchased and given to the crime lab. Agent Ray denied that he ever gave any amount of the purchase to an informant. However, he clarified that it was common practice to, at times, give away some part of a purchase to an unwitting informant. Although Smyth was not an unwitting informant, only .144 grams of cocaine made it to the crime lab in this instance.

'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, th[e] [Supreme] Court explicitly tied the miscarriage of justice exception to the petitioner's innocence." *Schlup,* 513 U.S. at 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (*citing Kuhlmann,* 477 U.S. at 452, 106 S.Ct. 2616, 91 L.Ed.2d 364; *Carrier,* 477 U.S. at 496, 106 S.Ct. 2678, 91 L.Ed.2d 397). "Explicitly tying the miscarriage of justice exception to innocence thus accommodates both the systemic interests in finality, comity, and conservation of judicial resources, and the overriding individual interest in doing justice in the 'extraordinary case.'" *Schlup,* at 322, 115 S.Ct. at 851.

In *Schlup,* the Supreme Court established the standard of federal review of procedurally defaulted constitutional claims only in those cases where the petitioner has shown that a " 'constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Schlup,* 513 U.S. at 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (*quoting Carrier,* 477 U.S. at 496, 106 S.Ct. 2678, 91 L.Ed.2d 397). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.,* at 324, 115 S.Ct. 851, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. A petitioner must show that, in light of the new evidence, "it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt." *Id.,* at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

■ Petitioner can meet this *Schlup* burden if he presents "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the Court is also satisfied that the trial was free of nonharmless constitutional error." *Id.,* at 316, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. Accordingly, an actual innocence claim under *Schlup* is " 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim[s] considered on the merits.'" *Schlup,* 513 U.S. at 315, 115 S.Ct. 851, 130 L.Ed.2d 808 (*quoting Herrera v. Collins,* 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)).

■ The Supreme Court in *Schlup* explained that the gateway is intended to "focus the inquiry on actual innocence," rather than legal innocence. *Id.,* at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. *See also, Calderon v. Thompson,* 523 U.S. 538, 118 S.Ct. 1489, 1503, 140 L.Ed.2d 728 (1998) (" '[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence.' ") (*quoting Sawyer,* 505 U.S. at 339, 112 S.Ct. 2514, 120 L.Ed.2d 269). Thus, this court is "not bound by rules of admissibility that would govern at trial." *Schlup,* 513 U.S. at 327, 115 S.Ct. 851, 130 L.Ed.2d 808. "[T]he emphasis on 'actual innocence' allows the reviewing tribunal to consider the probative force of relevant evidence that was either excluded or unavailable at trial." *Id.,* at 327–28, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. Hence, this court must evaluate petitioner's claims " 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial.'" *Id.,* at 328, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

Furthermore, this court must consider the "probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup,* 513 U.S. at 332, 115 S.Ct. 851, 130 L.Ed.2d 808. "The newly presented evidence may ... call into question the *credibility of witnesses* presented at trial." *Id.,* at 330, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (emphasis added).

The respondent contends that attacking the circumstances of Mr. Bragg's identification by Officer Ray is "strictly impeachment, peripheral, material." (Docket entry # 49, page 10) Citing *Morris v. Dormire*, 217 F.3d 556, 559 (8th Cir. 2000), Respondent further contends that evidence going "only toward impeachment is insufficient to establish actual innocence." *Id.*

Respondent's reliance upon *Morris* is misplaced. The Court of Appeals in *Morris* found the "impeachment" evidence in question to have little value as they stated, "We also doubt their testimony has much, if any, impeachment value." *Id.* The *Morris* Court held that "evidence must be 'so forceful that it is more likely than not that no reasonable [trier of fact] would have convicted [defendant] in light of the new evidence.'" *Id.* (*internal quotation omitted in original*). As verified by two of the three prosecuting attorneys involved, the evidence in this case is exactly the kind of evidence contemplated by the Court in *Morris*.

*a. Newly Discovered Evidence*

 The United States Court of Appeals for the Eighth Circuit has held that, under *Schlup*, this court may only consider evidence that was "not available at trial and could not have been discovered earlier through the exercise of due diligence." *Amrine v. Bowersox*, 128 F.3d 1222, 1230 (8th Cir.1997) (*en banc*). AEDPA does not provide guidance as to how "due diligence" should be defined by a *habeas* court, *see* 28 U.S.C. §§ 2244(b)(2), 2241(d)(1), 2254(e)(A)(ii), 2255, 2264(a), nor is there any clearly accepted meaning of "due diligence" in the *habeas* context. Yet, this term is commonly used in other areas of the law which may be sufficiently analogous for the court to properly construe the phrase. *See e.g., Lewis v. Alexander*, 987 F.2d 392, 396–397 (6th Cir. 1993)(Rule 60(b)(1) relief available when counsel exercised "due diligence" in attempting to comply with time constraints but misread date-stamp on notice of appeal); *United States v. Walus*, 616 F.2d 283, 303–304 (7th Cir.1980) (Rule 60(b)(1) relief available when "newly discovered evidence" which by "due diligence" was not uncovered in time to move for new trial); *McCleskey v. Zant*, 499 U.S. 467, 496, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991)(unavailability of evidence may be basis for showing "cause" to avoid procedural bar so long as unavailability is judged according to the "principle that petitioner must conduct a reasonable and diligent investigation").

Clearly respondent's chief defense is that the evidence presented by petitioner both in his petition and at the hearing could have been discovered through the exercise of "due diligence." However, it is incontrovertible that this evidence was not readily available and only discovered during the replevin action initiated by petitioner well after his trial and conviction.

Numerous witnesses testified that this evidence was not available to petitioner at the time of his trial. Subsequent to petitioner's trial, his attorney, Chuck Honey, passed away. Mr. Honey's son, Marc Honey testified at the hearing and reported that he was currently the custodian of his father's files. He testified that he searched diligently for any records pertaining to the civil forfeiture action and he was unable to find any of these documents.

Petitioner's first lawyer who was conflicted out of the case, Jim Pedigo, also testified at the hearing. Mr. Pedigo testified that, at the time he represented Mr. Bragg, he requested the relevant investigator's reports and never received them. Mr. Pedigo further testified that he never knew of any of the exculpatory documents that were revealed during the replevin action.

Prosecuting attorney Danny Rogers confirmed that the information was not readily available. Mr. Rogers testified that he was only aware of this exculpatory evidence when he read through the plead-

ings while observing the hearing concerning petitioner's action in replevin.

The Deputy Prosecutor who handled the seizure action for the state, Taylor King, also testified at the hearing. Although Mr. King testified he served the initial notice of seizure for uncontested forfeiture on petitioner, he never sent petitioner the exculpatory investigator's report that was a part of the civil file. Mr. King also testified that, since petitioner failed to answer by filing a notice for judicial referral, he did not serve or mail to petitioner any of the additional pleadings in the case.

Although the State tried to use Mr. King to support their contention that petitioner could have obtained the exculpatory information in the civil file pertaining to the seizure of the vehicle, this court is not persuaded that the presence of this information in a civil file unrelated to the prosecution should be considered discoverable through due diligence. Testimony at the evidentiary hearing refuted this contention in two ways. First, both petitioner and his attorneys were concerned primarily about his impending criminal case and believed the forfeiture needed to be given a much lower priority. Second, the notice served on Mr. Bragg was fairly generic and did not put Mr. Bragg or his counsel on notice that any exculpatory evidence would have materialized through review of the civil file.

In his post-hearing brief, respondent argues that evidence such as the June 21, 1994 photographs of Mr. Bragg "was reasonably available" to petitioner at the time of trial. (Docket entry # 49, page 6) Indeed some of this information was available at that point in time. However, an issue central to this case is when the *investigator's notes* from the 1994 incident became available to petitioner, thus rendering this other evidence exculpatory. In other words, the evidence petitioner presented did not become exculpatory until it surfaced along with the 1994 investigator's notes. These fabricated investigator's notes, which clearly were not available at

the time of trial, reveal that the evidence used to obtain approval to prosecute this case, used to support an application for the original arrest warrant, and used to condemn petitioner before a jury at trial was misleading and false. Error compounded into more error, and due process was lost.

In specifically addressing respondent's argument regarding the photographs of Mr. Bragg the court finds that, but for the suppressed investigator's notes, the fact Mr. Bragg's photographs were not on file until June 21, 1994 is of little consequence. However, the fact that these photographs were not on file at the time Agent Ray claims that he used them to identify Mr. Bragg as the perpetrator is highly significant. It was the uncovering of the investigator's notes that gave rise to Mr. Bragg questioning the timing of events recited by Agent Ray and ultimately the veracity of his testimony.

Accordingly, the court finds that the new evidence presented in petitioner's *habeas* petition and at the evidentiary hearing could not have been discovered for trial through due diligence. To hold that petitioner could have commenced discovery of this information through review of an only tangentially related civil matter while criminal charges were looming would be manifestly unjust.

### b. *Reliability of the Evidence.*

In addition to petitioner's evidence being new and undiscoverable, petitioner's evidence is highly reliable. Petitioner's evidence consists mainly of police records and official records from agencies of the State, as well as statements and testimony from law enforcement officials.

In his post-hearing brief, respondent argues that some of the testimony regarding the date of the sale of the 1987 Ford Mustang was unreliable. (Docket entry # 49, page 7) Yet, respondent fails to recognize the highly reliable and objective nature of the official registration and sale records. For example, the application for

title and registration from the Arkansas Department of Finance and Administration undeniably shows the date that the vehicle was registered and the license plate number XOM 157 issued was March 23, 1994. (Pet'r.'s ex. 19)

Respondent further contends that doubt arises from a copy of the vehicle's title showing a lien with a date of February 14, 1994. (Resp't's ex. 16–19) However, this lien was not filed until September 8, 1994, six days after the South Central Drug Task Force seized the vehicle. (Resp't's ex. 4 & 19) More importantly, Jim Pedigo testified that he had assisted the lien holder, Ms. Lanoir Leeper, by providing proper documentation so that she could file such a lien on the vehicle to protect her interest. Clearly Ms. Leeper had a vested interest in seeing that the date of the lien was prior to the date of Mr. Bragg's arrest in an effort to thwart the forfeiture action. Thus, compared to the objective and official registration documents, the date of Ms. Leeper's lien "after the fact" is insignificant.

Likewise, the respondent argues that petitioner and his witnesses were hardly credible and "Officer Ray was unwavering and consistent in his testimony that Petitioner was the subject who sold him crack on that day." (Docket entry number 49, page 10) The court deems that the *only* consistent statement by Agent Ray at trial and at the evidentiary hearing was that petitioner sold him crack on March 26, 1993. Given the overwhelming evidence of Agent Ray's fabrication of evidence in this case, his evasive answers during examination, and his inability to provide any plausible explanation for his actions, it is illogical to conclude that *any* of Agent Ray's testimony was credible.

Accordingly, the Court finds that petitioner's documentary and testimonial evidence is reliable evidence material to his showing of actual innocence. *See Schlup,* 513 U.S. at 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (petitioner must support claim of actual innocence with "reliable evidence");

*Amrine,* 128 F.3d at 1230 (*habeas* court must determine if the "evidence is reliable").

### c. Probative Value of the Newly Discovered Evidence.

■ The court also concludes that, in light of the new evidence, it is "more likely than not that no reasonable juror would have" believed Agent Keith Ray's trial testimony as to petitioner's guilt. *Schlup,* at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. That is, it is more likely than not that any reasonable juror, conscientiously obeying the instructions of the trial court, would have a serious doubt as to the veracity of Agent Ray's trial testimony. *Id.,* at 329, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. This court can easily come to this conclusion given this highly reliable evidence showing grievous discrepancies in Agent Ray's testimony. Furthermore, this court's conclusion is confirmed by two of the three prosecutors who testified at the evidentiary hearing. Danny Rogers and Henry Morgan both testified they would not have prosecuted the case given this highly exculpatory evidence.

Because the State's case against petitioner was based entirely on the testimony of Agent Keith Ray, the court concludes that in light of the new evidence, it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.,* at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

The court recognizes that a finding that Agent Ray's testimony is not worthy of belief, and would not be believed by any reasonable juror, is sufficient to satisfy the *Schlup* standard. As previously noted, Agent Ray's testimony was the linchpin of the State's case. Without Agent Ray's testimony, the identity of petitioner was unattainable. With Agent Ray's testimony rendered unworthy of belief, no evidence connects petitioner with the drug transac-

tion that allegedly occurred on March 26, 1993.

Hence, the court finds that petitioner has presented new evidence of innocence "so strong that [the] court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.*, at 316, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. *See also, Id.*, at 317, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 ("If the habeas court were merely convinced that the new facts raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error, Schlup's threshold showing of innocence would justify a review of the merits of the constitutional claims."). Since failure of this court to review the merits of petitioner's claims would result in a fundamental miscarriage of justice, the court concludes that petitioner passes through the *Schlup* gateway and petitioner must have his constitutional claims reviewed on the merits.

## VI. CONSTITUTIONAL CLAIMS

■ A state prisoner may petition this court for a writ of *habeas corpus* "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner may obtain federal habeas corpus relief "only upon proving that [his] detention violates ... fundamental liberties ... safeguarded against state action by the Federal Constitution." *Wessling v. Bennett*, 410 F.2d 205, 209 (8th Cir.1969) (*quoting Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). " '[I]t is not the province of a federal habeas court to re-examine state-court determinations of state-law questions,' " *Gee v. Groose*, 110 F.3d 1346, 1349 (8th Cir.1997) (*quoting Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). Rather, this court is limited " 'to deciding whether a conviction

violates the Constitution, laws or treaties of the United States.' " *Id.*

### A. Due Process / 14th Amendment Violation for Presentation of Perjured Testimony.

■ Petitioner has alleged prosecutorial misconduct due to the false and misleading testimony of Agent Keith Ray. The Due Process Clause of the Fourteenth Amendment forbids the knowing use by the State of perjured testimony. *Giglio v. U.S.*, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Generally, to obtain relief on a claim that the State introduced "false evidence," petitioner has the burden of demonstrating: (1) that a witness testified falsely, (2) that the false testimony was material, and (3) that the prosecution offered the testimony knowing it to be false. *Giglio*, 405 U.S. at 153–54, 92 S.Ct. at 766.

■ Perjury is committed when a witness "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993). The burden is on a petitioner to show the state knowingly used false testimony to obtain the conviction. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

■ For obvious reasons, a conviction obtained through the use of false evidence, *known* to be false by the prosecutor, denies a defendant liberty without due process of law. *Giglio*, at 153, 92 S.Ct. at 765 (1972); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). Yet, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected." *Napue, supra*, 360 U.S. at 269, 79 S.Ct. at 1177; *see also Giglio, supra*, 405 U.S. at 153, 92 S.Ct. at 765.

■ Thus, it follows that a defendant's due process rights can be violated when

the prosecutor was not, but should have been, aware that a State's witness was lying. *Buitrago v. Scully,* 705 F.Supp. 952 (S.D.N.Y.1989). It also follows that, when considering "knowing" use of perjured testimony, courts may decline to draw a distinction between the police agents and prosecutors and focus instead upon the "prosecution team" which includes both the investigative and prosecutorial arms. *United States v. Antone,* 603 F.2d 566, 569 (5th Cir.1979); *see United States, v. Meros,* 866 F.2d 1304 (11th Cir.1989); *see also Ex parte Fierro,* 934 S.W.2d 370 (Tex. Crim.App.1996), *cert. denied,* 521 U.S. 1122, 117 S.Ct. 2517, 138 L.Ed.2d 1019 (1997)(Due process prohibits prosecutors from presenting testimony that any member of the prosecution team, including investigating and prosecutorial personnel, knows to be false).

 Petitioner has clearly shown that Agent Ray's testimony was false. Specifically, Agent Ray falsely testified that he excluded Rodney Mitchel through photographs, that he obtained Rodney Bragg's identity through running his license plates on March 1, 1994, and that he positively identified Rodney Bragg on or about March 1, 1994 through photographs on file at the Sheriff's Department[4]. Agent Ray clearly "knowingly" gave this false testimony at trial. The State put forward no evidence that would even hint that Agent Ray may have unknowingly given this false testimony and did not produce anything during discovery that would have alerted a diligent attorney that something was awry. Finally, although the evidence at the evidentiary hearing failed to show that the prosecuting attorneys intentionally allowed Agent Ray to give false testimony, the element of "knowing" is imputed on the prosecutors through Agent Ray's

actions. *Antone,* 603 F.2d at 569; *Meros,* 866 F.2d 1304.

In addition, during the evidentiary hearing, petitioner showed that Agent Ray's investigator's notes stating that Rodney Mitchel and Rodney Bragg were the same person should have put prosecutor Brent Haltom[5] on notice that Agent Ray's testimony about excluding Rodney Mitchel was false. Prosecutor Haltom allowing false testimony to go "uncorrected" was a clear violation of petitioner's due process rights. *Napue,* at 269, 79 S.Ct. 1173; *Giglio,* at 153, 92 S.Ct. 763.

### B. Brady Violation.

Petitioner also claims that the State had a duty to disclose exculpatory evidence. Petitioner relies on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) to advance his claim.

The Supreme Court recounted the rationale behind *Brady* and the "essential components of a *Brady* violation" as follows:

> In *Brady* this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S., at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such evidence is material "if there is a reasonable probability that,

---

4. Agent Ray's trial testimony regarding the March 26, 1993 incident was also called into question with his testimony at the evidentiary hearing. However, petitioner has met his burden even without consideration of this testimony.

5. Prosecutor Brent Haltom performed the direct examination of Agent Ray at trial. (Trial Tr. 179–219)

had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*, at 682, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481; *see also Kyles v. Whitley*, 514 U.S. 419, 433–434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Id.*, at 438, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555, 131 L.Ed.2d 490.

These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest; therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

This special status explains both the basis for the prosecution's broad duty of disclosure and our conclusion that not every violation of that duty necessarily establishes that the outcome was unjust. Thus the term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "Brady material"—although, strictly speaking, there is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 280–81, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (internal footnotes omitted).

C. *The State's Failure to Disclose Evidence Favorable to Petitioner.*

 i. *Failure to Disclose Agent Ray's Investigator's Notes.*

 Agent Ray's investigator's notes are clearly exculpatory and "*Brady* material" because compared to petitioner's documentation relating to the purchase of the Mustang they clearly establish that petitioner was not involved in the alleged drug transaction, and because they allow petitioner to easily impeach the trial testimony of Agent Ray. Because these notes were created by a police investigator, Brent Haltom had a duty to discern these notes and to disclose them to petitioner's trial counsel. *Strickler*, 119 S.Ct. at 1948.

 ii. *Failure to Disclose Nonexistence of Photographs of Mitchel and Bragg.*

Although prosecutors most likely did not realize the photographs in question were not on hand during Mr. Bragg's prosecution, the existence or nonexistence thereof was still an issue under the control of the State. This evidence should have been disclosed to the defense. Realizing the difficulty involved with disclosing the nonexistence of evidence, it is a difficult proposition to hold prosecutors strictly accountable in this instance. Nevertheless, Agent Ray knew of the existence of this exculpatory evidence and his knowledge is imputed to prosecutors. *Id.*

D. *The Prejudice Resulting from the State's Failure to Disclose Brady Material.*

Petitioner is entitled to *habeas* relief if he can establish that the evidence the

State failed to disclose was "material." *Id.* Evidence is material if its nondisclosure results in sufficient prejudice. *Id.* Thus, petitioner must establish sufficient prejudice resulting from the State's failure to disclose Agent Ray's investigator's notes. *Id.* Petitioner must establish that there is a " 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id. (citing Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Bagley,* 473 U.S. at 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Petitioner establishes sufficient prejudice if the " 'favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Strickler,* 119 S.Ct. at 1952 (*quoting Kyles,* 514 U.S. at 435, 115 S.Ct. 1555, 131 L.Ed.2d 490). In determining whether petitioner has demonstrated sufficient prejudice, this court must consider the "net effect of the evidence withheld by the State." *Kyles,* 514 U.S. at 421–22, 115 S.Ct. 1555, 131 L.Ed.2d 490.

This analysis provides an interesting twist to an already intriguing case. Had Agent Ray's notes and information regarding the photographs been discovered by *prosecutors,* it is likely that petitioner would not have been prosecuted. As previously reported, two prosecutors reported that it was likely they would have dismissed the case had this information been available at trial.

Certainly if defense counsel had this information, they would have used it in the cross-examination of Agent Ray. As prosecutor Danny Rogers surmised at the evidentiary hearing, defense counsel could have closely held this information only to reveal it on cross examination and "the case would have been over." Defense's revelation of this information would have destroyed Agent Ray's testimony of identi-

fying the suspect as Rodney Bragg as well as his subsequent review of photos and positive identification of him as the perpetrator from the March 1, 1994 event.

Accordingly, the Court concludes that the investigator's notes and information about the photographs on file were material evidence because their suppression resulted in significant prejudice to petitioner. Had the information been disclosed, it unquestionably would have played a prominent role at trial. Quite possibly, as surmised by Mr. Rogers, the trial would have "been over" had they been disclosed. The contents of the notes would have led defense counsel to easily attainable credible evidence to refute Agent Ray's statements and would have had a devastating impact on Agent Ray's credibility at trial.

For these reasons, the court easily concludes that nondisclosure of the highly questionable and unreliable evidence from Agent Ray's investigator's notes resulted in the extremely favorable and undeserving credibility of Agent Keith Ray during trial. Thus, the investigator's notes and the possible earlier draft of his report, supposedly destroyed [6], were very material evidence and their suppression resulted in significant prejudice to petitioner.

The court again easily concludes that there is a " 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Strickler,* 119 S.Ct. at 1952 (*citing Kyles,* 514 U.S. at 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490; *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375, 87 L.Ed.2d 481). While certainty rarely exists as to how a jury would have treated the excluded evidence in a case, the court's determination is supported by testimony of two prosecuting attorneys who testified that this exculpatory evidence would have had a tremendous impact upon the case. Thus, the presumed effect of this evidence can

---

6. Again, Agent Ray testified he destroyed the original report after making requisite corrections.

"reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler,* 119 S.Ct. at 1952 (*quoting Kyles,* 514 U.S. at 435, 115 S.Ct. 1555, 131 L.Ed.2d 490).

Had the State disclosed these notes, taking into account the probable evidentiary rulings of the trial court, the jury would have been entitled to find that Agent Keith Ray was an unreliable and incredible witness whose testimony was false and misleading in light of his own notes compared to his testimony of events[7]. The jury would have also been entitled to find that petitioner was a credible witness and his testimony was supported by his own documentation.

"Since all of these possible findings were precluded by the prosecution's failure to disclose the evidence that would have supported them, 'fairness' cannot be stretched to the point of calling this a fair trial." *Kyles,* 514 U.S. at 453–54, 115 S.Ct. 1555, 131 L.Ed.2d 490. The prosecution's failure to disclose evidence favorable to the defense rendered petitioner's trial fundamentally unfair and deprived petitioner of his right to a fair trial. Because Mr. Bragg was denied the due process to which he was entitled under the United States Constitution, the court hereby grants his Amended Petition for Writ of Habeas Corpus.

■ The habeas corpus statute authorizes a federal court to dispose of *habeas* petitions "as law and justice require." 28 U.S.C. § 2243; *Hilton v. Braunskill,* 481 U.S. 770, 775, 107 S.Ct. 2113, 2118, 95 L.Ed.2d 724 (1987); *Davis v. Reynolds,* 890 F.2d 1105, 1112 (10th Cir.1989). The mandate of the statute "is broad with respect to the relief that may be granted." *Carafas v. LaVallee,* 391 U.S. 234, 239, 88 S.Ct. 1556, 1560, 20 L.Ed.2d 554 (1968). The federal court has " 'the largest power to control and direct the form of judgment to be entered in cases brought up before it on habeas corpus.' " *Hilton,* 481 U.S. at 775, 107 S.Ct. at 2118 (citation omitted). Thus, a district court may exercise its broad authority in habeas cases to grant any relief it deems necessary, including the permanent discharge of a successful *habeas* petitioner. *Burton v. Johnson,* 975 F.2d 690, 693 (10th Cir.1992) (*quoting Levy v. Dillon,* 415 F.2d 1263, 1265 (10th Cir.1969)).

■ Given the egregious nature of this case, the court finds that the immediate issuance of the mandate is not only just, but also required. *See e.g. Stallings v. Tansy,* 28 F.3d 1018, 1020 (10th Cir.1994); *Kelly v. Roberts,* 998 F.2d 802 (10th Cir. 1993). Mr. Bragg has been in custody over four years for a crime the State could have never proven without lies, omissions, and deception. Allowing these charges to remain pending for any additional length of time would be wholly unjust.

Accordingly, the court vacates the Judgment and Sentence in *State of Arkansas v. Rodney L. Bragg,* Case Number CR 96 00820, Circuit Court of Nevada County. The Court further orders the respondent to immediately release petitioner from all custody resulting from this Judgment and Sentence. Petitioner shall be transported back to the Arkansas Department of Correction and respondent shall immediately begin out-processing petitioner. Petitioner shall be allowed accompaniment of his

---

7. In view of all of the circumstantial evidence presented, this court surmises that the following occurred: Agent Ray either constructed or reconstructed his investigator's notes on or about July 14, 1994. The court arrives at this date through the ACIC terminal input log showing a "hit" for license plate XOM 157 when, as Mr. Bragg testified, he had driven the car out of state to Wichita, Kansas. Agent Ray doubtlessly produced these documents, bolstering the facts contained therein, to apply for a warrant for Mr. Bragg's arrest. (Pet'r.'s ex. 7) This application for arrest warrant for the 1994 incident was, coincidentally, also drafted on July 14, 1994. (Resp't.'s ex. 3) The Felony Information for the 1993 incident was drafted, also coincidentally, a day later on July 15, 1994. (Docket entry # 12, page 3) July 14, 1994 was a Thursday. This fact fails to corroborate Agent Ray's testimony that he "reconstructed" these notes on a weekend.

counsel to ensure he is out-processed as rapidly as possible. It is the intention of this court that Mr. Bragg complete out-processing and be released from custody by the Arkansas Department of Correction this day. The court further orders petitioner released on personal recognizance pending appellate review should respondent choose to appeal, this in accordance with Federal Rule of Appellate Procedure 23.

THEREFORE,

IT IS HEREBY ORDERED that Petitioner's Amended Petition for Writ of Habeas Corpus (Docket # 18) is GRANTED. IT IS FURTHER ORDERED that the Judgment and Sentence in *State of Arkansas v. Rodney L. Bragg,* Case Number CR 96 00820, Circuit Court of Nevada County, is VACATED.